1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SUMMIT ICE MELT SYSTEMS, INC.,

Plaintiff,

v.

HOTEDGE, LLC,

Defendant.

Case No. 3:24-cv-00066-ART-CSD

ORDER

(ECF Nos. 6, 34, 36, 50, 52)

10
11
12
13
14
15
16
17
18

Plaintiff Summit Ice Melt Systems, Inc., a manufacturer of products that melt ice on roofs, sued Defendant HotEdge, LLC, another manufacturer of products that melt ice on roofs, for unauthorized use of Summit's registered trademark "PRO." Summit seeks injunctive relief barring HotEdge from using Summit's "PRO" mark and requiring HotEdge to preserve evidence of prior use. (ECF Nos. 6, 19, 32, 49, 50, 52, 53, 56.) HotEdge has also filed an answer and a counterclaim seeking to void Summit's trademark, (ECF No. 35), and moved to dismiss two counts in Summit's First Amended Complaint (ECF No. 29). (*See* ECF Nos. 34, 46, 47.)

19
20

The Court denies Summit's motion for preliminary injunctive relief and HotEdge's motion to dismiss.

21

## I.    FACTUAL AND PROCEDURAL BACKGROUND

22
23
24
25
26
27
28

Summit has used the "PRO" mark to sell its premiere ice-melting system since May 2013, though it marketed the product as the "Radiant Edge PRO Roof Ice Melt System" and "PATENTED Radiant Edge PRO Roof Ice Melt System" until late 2017. (ECF Nos. 6, 53-3.) Summit's ice-melt system may be installed on existing roofs or in new construction, including remodels. Summit applied for a trademark for "PRO" in 2017. The USPTO rejected its first application as descriptive, but Summit convinced the agency that the mark was suggestive and

ambiguous. (ECF No. 32-3.) The USPTO approved Summit's application and added "PRO" to the registry. (ECF No. 6-2.)

Defendant Hotedge, LLC, also sells roof ice-melt systems. HotEdge claims to have used "PRO" in the title of several of its products since 2015, including the HotMetal PRO, HotMetal PRO2X, HotShingle PRO, the HotValley PRO, HotFlashing PRO, HotShingle PRO2X, HotSlate PRO, HotShake PRO, and the HotTile PRO. (ECF No. 19.) HotEdge alleges that it uses "PRO" to designate products that are for construction professionals like architects, designers, and general contractors, and that the PRO line of products is exclusively marketed for new construction and remodeling projects, not for installation on existing structures.

Summit and HotEdge's products compete with one another in the Lake Tahoe and Northern Nevada geographic areas, and at least some of their products are substitutes for one another as roof ice-melt systems. (ECF Nos. 6, 19.) Both companies have submitted bids for the same construction projects, though Summit claims it did not find out about HotEdge's use of the "PRO" mark until January 2024. HotEdge claims that it has been aware of Summit's products for several years, but that it did not realize that Summit had trademarked "PRO." (ECF No. 19-1.)

Both companies sell their products primarily to construction professionals and occasionally to individual homeowners. Summit explains that its customers are "ordinary homeowners who are unsophisticated in the field of roof ice melt systems" as well as "sophisticated residential and commercial owners." (ECF Nos. 6, 19-3.) At the hearing, Summit represented that around 75% of its sales come from industrial and professional purchasers, and 25% come from retail customers. (*See* ECF No. 60.) Both companies represented that they do not sell any products on the open market or through retail channels. (*Id.*) The only way that a prospective customer could obtain either company's products is by

2

contacting the company, providing details for the specific project, and requesting a quote. (*See id.*)

Shortly after Summit filed this lawsuit, HotEdge started administrative proceedings to cancel Summit's "PRO" trademark at the USPTO as descriptive or generic. (*See* ECF No 19.) HotEdge also counterclaimed asking this Court to do the same. (*See* ECF No. 18.) The USPTO stayed proceedings until the matter before this Court is resolved. *See Hotedge, LLC v. Summit Ice Melt Sys.*, T.T.A.B., 92085126-CAN, No. 10.

## II.   SUMMIT'S PRELIMINARY INJUNCTION

### A. Legal Standard

A movant seeking preliminary injunctive relief must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary" and "drastic" remedy that requires the moving party to clearly show that they carry the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up). The most important *Winter* factor is likelihood of success on the merits. *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

### B. Likelihood of Success on the Merits

Summit seeks preliminary injunctive relief for its federal trademark infringement claim, an unfair competition claims under 15 U.S.C. § 1125(a), its Nevada Deceptive Trade Practices Claim, and a Common Law Trademark Infringement claim. (ECF No. 29.) All of these claims rest on the federal standard for trademark infringement. *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1251 (9th Cir. 2022) (Lanham Act trademark infringement and unfair competition under the Lanham Act share "exactly the same" burden of consumer confusion);

NRS 598.0915(1), 598.0923(1)(c); *see BBK Tobacco & Foods, LLP v. Aims Grp. USA Corp.*, 723 F. Supp. 3d 973, 986 (D. Nev. 2024) ("[t]he elements of common law claims for trademark infringement and unfair competition mirror the federal standard" in Nevada). Accordingly, Summit's trademark infringement claim must be evaluated to determine if the preliminary injunction is warranted.

### 1. Trademark Infringement

Trademark infringement occurs when an unauthorized user of a mark sells goods using that mark in a way likely to cause confusion or mistake. 15 U.S.C. § 1114(1)(a). A successful claim for trademark infringement must show that (1) the claimant has a protectible ownership interest in the mark; and (2) the defendant's use of the mark is likely to cause consumer confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citing *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).

Although Summit has satisfied the first element by showing that it registered the "PRO" mark, (ECF No. 6-2); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (registration *prima facie* evidence of ownership interest), Summit has not shown the second element, likelihood of consumer confusion.

### a. Likelihood of Consumer Confusion

For success on the merits of its trademark infringement and unfair trade practices claims, Summit must show that HotEdge's use of the word "PRO" is likely to confuse Summit's and HotEdge's customers. Courts use the eight *Sleekcraft* factors to examine whether the similarity of the mark is likely to confuse customers about the source of the products. *See Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007) (quoting *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007)). These factors are (1) strength of the mark; (2) similarity of the marks; (3) proximity of the goods; (4)

1    evidence of actual confusion; (5) marketing channels used; (6) type of goods and

2    the degree of care likely to be exercised by the purchaser; (7) defendant's intent

3    in selecting the mark; and (8) likelihood of expansion of the product lines. *See*

4    *Lodestar Anstalt*, 31 F.4th at 1252; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341,

5    348–49 (9th Cir.1979), *abrogated on other grounds by Mattel Inc. v. Walking*

6    *Mountain Prods.,* 353 F.3d 792, 810 n.19 (9th Cir.2003).

7         The *Sleekcraft* factors must be applied "in a flexible fashion" and "may rest

8    on only those factors that are most pertinent to the particular case." *Rearden LLC*

9    *v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). Three factors are not

10   relevant at this stage: (4) actual confusion, (5) marketing channels used, and (8)

11   likelihood of expansion. Binding precedent prevents the Court from considering

12   the fourth factor, actual confusion, in deciding likelihood of consumer confusion

13   for a preliminary injunction. *See Network*, 638 F.3d at 1151.  The Court also

14   recognizes that the fifth factor, marketing channels used, does not apply because

15   using the Internet to market products is "properly accorded . . . no weight."

16   *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 725 (9th Cir.

17   2024). Finally, both parties and the Court agree that the eighth factor, likelihood

18   of product expansion, is not relevant to this case because Summit and HotEdge

19   are direct competitors. Accordingly, the Court does not consider these factors,

20   and only considers (i) strength of the mark; (ii) similarity of the marks; (iii)

21   proximity of the goods; (iv) type of goods and the degree of care likely to be

22   exercised by the purchaser; and (v) defendant's intent in selecting the mark.

### i.    The strength of Summit's "PRO" mark

24        The strength of a mark is relevant to evaluating likelihood of consumer

25   confusion, and it depends on two components: conceptual and commercial

26   strength. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

27   The Court evaluates whether Summit has shown either form of strength.

28        //

### 1. Summit's mark is conceptually weak.

Conceptual strength exists along a five-part spectrum. The "inherently distinctive" categories are arbitrary, fanciful, and suggestive; and marks that receive these classifications receive the most legal protection. 1 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 11:2 (5th ed.). Descriptive marks receive protection only when the mark has acquired distinctiveness through commercial use, also referred to as "secondary meaning," and generic marks receive no trademark protection. *Id.* Summit's registration of the mark with the USPTO entitles it to a rebuttable presumption of being suggestive. McCarthy § 11:43; (*see* ECF No. 32-2).

HotEdge, however, may rebut Summit's presumption of conceptual strength. "Suggestive marks are presumptively weak," and "[s]ome weak marks are weaker than others." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010) ("line between descriptive and suggestive marks . . . nearly incapable of precise description") (citing *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir.2009)). To assess conceptual strength, the Court applies the "imagination test" and "competitors' needs test," which both show that Summit's mark is weak.

The imagination test asks if "imagination or a mental leap" is required to reach a conclusion about the nature of the product being referenced. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010) (quoting *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007)). A mark is weak if it "describe[s] some aspect of the product." *Id.* (citing *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970)). For example, the marks "ENTREPRENEUR," "Aviation," and "Classroom" applied to magazines about entrepreneurs, aviation, and the instruction of students, respectively, do not require imagination and are thus weak. *Id.*; *Entrepreneur Media, Inc. v. Smith*,

279 F.3d 1135, 1142 (9th Cir. 2002). Applying the imagination test, this Court finds that the "PRO" mark describes Summit's ice-melting system as having professional quality. *See Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 798 (N.D. Cal. 2024) ("little-to-no mental leap required to understand that GOOD MEAT describes [Good Meat Project's] services").

The "PRO" mark is also weak under the competitors' needs test, which asks to what extent a mark is needed by competitors to identify their goods or services. *Zobmondo*, 602 F.3d at 1117. If competitors need to use a mark to describe their product, the mark is weak. *See id*; *see M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1088 (9th Cir. 2005) ("use of similar marks by third-party companies in the relevant industry weakens the mark"). HotEdge has argued that it uses the mark "PRO" to describe its line of products made for professionals. (ECF No. 19.) Other products, for example, the roof-gutter-de-icing "PD Pro Series," also use the mark for this purpose. (ECF No. 19-1, at 76). It is not obvious how a competitor could indicate that their products are meant for construction professionals without using either "professional" or "pro" in the product title.

**2. Summit's mark is commercially weak.**

Next, the Court considers if Summit has shown that the "PRO" mark has commercial strength. "Commercial strength is based on actual marketplace recognition," and may be proven, for instance, through advertising expenditures. *Network*, 638 F.3d at 1149 (internal citations omitted). Summit has asserted that it advertises its products to customers who live in areas with significant snowfall and that it has spent "significant funds" to promote its products. (ECF No. 6-1.) These assertions do not suffice as proof of commercial strength.

**3. Summit's mark is weak.**

Summit points to *Brookfield* for the proposition that strength of the mark is not weighed when the mark is identical and the two products are closely related, but *Brookfield* is a domain-name case. 174 F.3d at 1059; *see Rearden*

*LLC*, 683 F.3d at 1209–10 ("internet trinity" *Sleekcraft* factors less important in cases that are not about domain names).

Accordingly, the Court finds that strength of the mark is a factor deserving moderate weight and that Summit's mark is weak. A weak mark may still receive protection if the infringing mark is "quite similar, and the goods closely related." *Sleekcraft*, 599 F.2d at 350.

### ii.    Similarity of Marks

Similarity of the marks is relevant to finding likelihood of consumer confusion. The Court considers the marks' "appearance, sound, and meaning;" it considers the marks "in their entirety and as they appear in the marketplace;" and it weighs "similarities . . . more heavily than differences." *Pom Wonderful*, 775 F.3d at 1127–28.

HotEdge and Summit use "PRO" in a similar manner. Summit advertises the "PATENTED PRO® Roof Ice Melt System," the "Radiant Edge PRO Roof Ice Melt System," the "PATENTED Radiant Edge PRO Roof Ice Melt System," and refers to its product as "the PRO." (*See* ECF Nos. 6, 53-3.) HotEdge advertises the HotMetal PRO, the HotMetal PRO2X, the HotShingle PRO, the HotValley PRO, and others. (ECF No. 19.) Both companies use "PRO" in black capital letters that are around the same size as the surrounding words. Both companies intend the same meaning for PRO, as in, a laudatory connotation associated with products of professional quality or for professionals. *See supra*.

The key difference is that Summit uses "the PRO" alone, while HotEdge's uses "PRO" after various "Hot" words, often followed by numbers. While the marks sound identical, HotEdge's product names that use the mark look and sound distinct in their entirety and as they appear in the marketplace.

Summit argues that the Ninth Circuit's finding of similarity in *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.* requires this Court to weigh this factor heavily in finding a likelihood of confusion, but in that case, both companies'

"dominant words ["Quinta"] frequently appear[ed] without anything more in the marketplace," and there is no evidence here of HotEdge using the mark "PRO" without the surrounding words. 762 F.3d 867, 876 (9th Cir. 2014).

While meaningful differences exist between the marks in their entirety, the Court weighs similarities more heavily than differences to find that this factor weighs moderately in favor of consumer confusion.

### iii.    Proximity of Summit and HotEdge's Products

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield,* 174 F.3d at 1055. Whether goods are closely related is "less important if advertisements are clearly labeled or consumers exercise a high degree of care, because rather than being misled, the consumer would merely be confronted with choices among similar products." *Network*, 638 F.3d at 1150. Weighing two parties' status as direct competitors too heavily can be clear error. *Id.*

Both Summit and HotEdge sell systems for melting ice on roofs in similar geographic markets to construction professionals. (*See* ECF No. 60.) Both companies have submitted bids on the same construction projects for rooftop ice-melting systems. (*See* ECF Nos. 19-1, 32-5.) While this would normally weigh heavily in favor of consumer confusion, it is not dispositive because of the following factor: the degree of care a reasonable purchaser is likely to exercise in selecting the product.

### iv.    Degree of Care Likely to Be Exercised by Purchaser

Whether a "'reasonably prudent consumer' would take the time to distinguish between the two product lines" is relevant to finding consumer confusion. *Surfvivor Media*, 406 F.3d 625, 634 (9th Cir. 2005) (quoting *Brookfield*, 174 F.3d at 1060). The Court finds that consumers of Summit's and HotEdge's products are likely to exercise a high degree of care in selecting their products because both products are expensive, most buyers are construction

professionals, and both products are sold through a quote system. This factor weighs heavily against finding consumer confusion.

First, the risk of confusion is minimal because both companies' products cost several thousand dollars. *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (finding confusion unlikely for products that cost several thousand dollars). Summit argues that "even purchasers of high-end products who exercise great care" can easily be confused, citing *Boldface Licensing + Branding v. By Lee Tillett, Inc.*, but the products in that case were cosmetics ranging between $6.49 and $100. 940 F. Supp. 2d 1178, 1189 (C.D. Cal. 2013). Consumers are likely to exercise great care on home improvements, like these roof ice-melt systems, that cost several thousand dollars.

Second, risk of confusion is minimal because both companies primarily market their products to construction professionals. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) (finding fact that purchasers were "highly specialized professional[s]" weighs "heavily against finding a likelihood of confusion in the relevant purchasing population"). At the hearing, Summit stated that only twenty-five percent of its sales are retail, and the rest are made to construction professionals. (ECF No. 60.) HotEdge, on the other hand, markets its "PRO" line of products exclusively for remodels and new construction, (*see* ECF No. 19-1), which are more likely to be undertaken by construction professionals than by individual homeowners. The reasonably prudent consumer in this case is most likely a construction professional, and construction professionals are unlikely to be confused by HotEdge's use of "PRO."

Finally, the risk of consumer confusion is minimal because both products are sold through a quote system. Neither Summit nor HotEdge sell their products on the open market. (ECF No. 60.) Their products are not available through retail channels or even directly for purchase through their website. (*Id.*) A consumer looking to purchase either "the PRO" or a "HotShingle PRO" must communicate

with a Summit or HotEdge representative about their project and about the product to receive a quote. (*Id.*) Summit hypothesizes that a homeowner whose neighbor recommended "the PRO" ice-melting system might be confused about which product it is. The fact that this consumer cannot make an impulse purchase, must consider the name and nature of the product several times before buying it, and also must interact with a company representative about the product weighs against finding consumer confusion.

Accordingly, this factor weighs strongly against Summit.

### v.    Lack of Willful Infringement

Whether an alleged infringer adopts a mark with actual or constructive knowledge that it is someone else's trademark is "relevant to the extent that it bears upon the likelihood that consumers will be confused." *Brookfield*, 174 F.3d at 1059. Intent to deceive the public is presumed when an alleged infringer knowingly adopts a mark resembling another's. *Off. Airline Guides*, 6 F.3d at 1394. The evidence before the Court so far does not show that HotEdge knowingly infringed on Summit's mark.

First, the timing of HotEdge's use of the "PRO" mark and Summit's protection of the mark weigh against finding knowing adoption of a protected mark. HotEdge has used the "PRO" mark since 2015 (ECF No. 19-1) and maintains that it first learned that Summit had registered the "PRO" mark when it received notice of this lawsuit. (ECF No. 6.) Evidence submitted by Summit shows that it did not include ™ or ® symbols on its web advertisements until 2018. (*See* ECF No. 53-3.) Summit also frequently changed its product name, to the point where a reasonable reader could have thought that Summit's trademark was "Radiant Edge PRO" or "PATENTED PRO Ice Melt System." (*Id.*; *see* ECF Nos. 32-1, 52-1.).

Additionally, HotEdge has so far credibly argued that its intent in adopting the "PRO" mark was to describe its professional series of products, not to mislead

consumers. *See Network*, 638 F.3d at 1153. This factor does not weigh in favor of finding consumer confusion.

Accordingly, this factor weighs against Summit.

### vi.    Summit is unlikely to show consumer confusion.

Considering the relevant *Sleekcraft* factors, the Court finds that Summit is not likely to succeed on the merits of its trademark claims because it has not shown that consumer confusion is likely. Summit and HotEdge sell to purchasers whose degree of care in selecting the product minimizes risk of confusion. Both products are expensive and sold primarily to construction professionals. Neither product can be purchased without obtaining a quote. The "PRO" mark is weak, and both companies use it descriptively. The Court is not convinced that HotEdge, which has used the "PRO" mark descriptively in its product names since 2015, has willfully infringed the mark.

On the other hand, Summit and HotEdge directly compete in the same geographic markets, and HotEdge uses the entire mark. These factors do not compel finding likelihood of confusion because both companies' customers are likely to exercise care for the reasons explained above, and HotEdge's use of words before and numbers after "PRO" reduces the salience of the marks' similarity.

### b. NDTPA claims

For the same reasons, Summit is also unlikely to succeed on the merits of its NDTPA claims. Any person who is a victim of consumer fraud may sue for relief under Nevada's Deceptive Trade Practices Act. NRS 41.600(1). Consumer fraud includes the following deceptive trade practices, for which Summit seeks relief: knowingly passing off goods or services for sale as those of another person (NRS 598.0915(c)) and knowingly violating a state or federal statute relating to the sale of goods (NRS 598.0923(1)(c)). Summit argues that HotEdge's use of "PRO" is passing off its products as Summit's or approved by Summit, in violation

1  of federal trademark law. (*See* ECF No. 6.)

2      The Court finds that Summit has not produced sufficient evidence to show

3  that HotEdge has knowingly passed off its products as Summit's for the same

4  reasons it finds that consumers are not likely to be confused. *See supra.* In

5  addition, the Court finds that because Summit has not shown trademark

6  infringement, it has not shown that HotEdge knowingly violated a state or federal

7  statute related to the sale of goods.

8      **C. Irreparable Harm**

9      A movant for a preliminary injunction must show they are "likely to suffer

10  irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. A

11  party seeking relief under the Lanham Act is "entitled to a rebuttable presumption

12  of irreparable harm upon . . . a finding of likelihood of success on the merits"

13  when seeking preliminary injunctive relief for a trademark violation. 15 U.S.C. §

14  1116(a). Without the presumption arising out of a likelihood of success on the

15  merits, "unsupported and conclusory statements regarding harm [a movant]

16  *might* suffer" will not suffice for preliminary injunctive relief. *Herb Reed*

17  *Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

18      Summit is not entitled to the Lanham Act's presumption of irreparable

19  harm because the Court has not found a likelihood of success on the merits. *See*

20  *supra.*

21      Nor has Summit proved irreparable harm independent of the Lanham Act's

22  presumption. In *Herb Reed Enterprises*, the Ninth Circuit found that the movant

23  failed to show irreparable harm, even with evidence of actual consumer

24  confusion. 736 F.3d at 1250. Despite being direct competitors, Summit claims

25  that it did not know that HotEdge had infringed until 2024, while HotEdge has

26  shown that it has used the "PRO" mark since 2015. (*See* ECF No. 32.) HotEdge's

27  alleged infringement has taken place over nine years, and Summit has failed to

28  produce any evidence of consumer confusion. Nor has Summit pointed to

13

1    evidence that HotEdge's use of "PRO" has seriously damaged Summit's
2    reputation, interfered with Summit's operations, or otherwise harmed Summit.
3    Finally, Summit has not shown why money damages would not be calculable or
4    otherwise vindicate the alleged infringement. The Court finds no likelihood of
5    irreparable harm.

6    **D. The Balance of Equities**

7    A movant for preliminary injunctive relief must show that "the balance of
8    equities tips in their favor." *Winter*, 555 U.S. at 20. The Court finds that without
9    irreparable harm or likelihood of success on the merits, "forcing [Defendant] to
10   undergo a massive rebranding of a name it has built up for about nine years"
11   outweighs the hardship of denying the injunction to Plaintiff. *See Good Meat
12   Project*, 716 F. Supp. 3d at 806 (quoting *Kiva Health Brands LLC v. Kiva Brands
13   Inc.*, 402 F. Supp. 3d 877, 899 (N.D. Cal. 2019). The balance of equities weighs
14   against granting an injunction.

15   **E. Public's Interest**

16   A movant for a preliminary injunction must also show that "an injunction
17   is in the public interest." *Winter*, 555 U.S. at 20. There does not appear to be a
18   public interest value in precluding use of the word "PRO" from a product market
19   where distinctions between products for lay and professional users may be
20   important. *See* 1 McCarthy § 1:24. Summit has not shown that a preliminary
21   injunction is in the public's interest.

22   **IV.    HotEdge's Motion to Dismiss**

23   HotEdge seeks to dismiss Summit's trademark-dilution claim because it is
24   based on the niche fame doctrine and Summit's Nevada Deceptive Trade Practices
25   Act (NDTPA) claim because Summit fails to allege reliance. The Court denies the
26   motion because Nevada law permits trademark-dilution claims based on niche
27   fame even though federal law no longer allows them, and reliance is not an
28   element of NDTPA claims based on unfair competition.

1    **A. Legal Standard**

2    A complaint must provide "a short and plain statement of the claim

3    showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp.*

4    *v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must be plausible and contain

5    more than a "recitation of the elements of a cause of action." *Ashcroft v. Iqbal*,

6    556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). All factual allegations

7    set forth in the complaint are taken as true and construed in the light most

8    favorable to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir.

9    2001). An otherwise plausible claim may be dismissed under Fed. R. Civ. P.

10   12(b)(6) for "lack of a cognizable legal theory." *Solida v. McKelvey*, 820 F.3d 1090,

11   1096 (9th Cir. 2016).

12   **B. Nevada Trademark Dilution**

13   The Court must decide if Nevada's trademark-dilution statute permits

14   claims based on niche fame. Nevada's statute prohibits the dilution of marks

15   famous in Nevada. NRS 600.435(1). A mark can be famous in Nevada based on

16   its "degree of recognition . . . [in] trading areas and channels of trade." *See* NRS

17   600.435(2)(f). Fame limited to channels of trade and trading areas is referred to

18   as "niche" fame. *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th

19   Cir. 2002).

20   Nevada's trademark-dilution law was modeled after the Lanham Act, which

21   previously permitted claims based on niche fame. *See Russell Rd. Food &*

22   *Beverage, LLC v. Galam*, 180 F. Supp. 3d 724, 741–42 (D. Nev. 2016); *compare*

23   15 U.S.C. § 1125(c) *with* NRS 600.435; *see Thane*, 305 F.3d at 908 (discussing

24   origin of niche fame doctrine). The Lanham Act was later amended to prohibit

25   claims based on niche fame. *See* 15 U.S.C. § 1125(c)(2)(A) (mark must be "widely

26   recognized by the general consuming public of the United States"); *Blumenthal*

27   *Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 870 (9th Cir. 2020). The Nevada

28   dilution statute was never changed to prohibit niche fame or otherwise amended.

1    Nevada's dilution statute therefore still permits claims based on niche fame.

2        While HotEdge argues that public policy disfavors the concept of niche

3    fame, *see* 3 McCarthy § 24:105, the Nevada Legislature has not modified the

4    statutory provisions that give rise to niche fame and must be considered when

5    deciding whether a party states a claim under NRS 600.435. The Court therefore

6    denies HotEdge's motion to dismiss Summit's NRS trademark-dilution claim.

7        **C. NDTPA**

8        HotEdge moves to dismiss Summit's NDTPA claim for not alleging reliance

9    and for not being pled with particularity. As no Nevada Supreme Court case

10   plainly holds that the claimant's reliance is or is not an element of the NDTPA,

11   this Court must predict how the Nevada Supreme Court would decide the issue.

12   This Court predicts that reliance is not an element of NDTPA claims based on

13   unfair competition and finds that Summit's pleading satisfies Rule 9(b).

14       **1. Reliance**

15       NRS 41.600 provides a cause of action to "any person who is a victim of

16   consumer fraud," including a "business competitor." *R.J. Reynolds Tobacco Co.*

17   *v. Eighth Jud. Dist. Ct.*, 514 P.3d 425, 433 (Nev. 2022). Consumer fraud includes

18   both knowingly passing off goods or services for sale as those of another person

19   and knowingly violating state and federal statutes relating to the sale of its goods.

20   *See* NRS 41.600, 598.0915, 598.0923(1)(c).

21       The Nevada Supreme Court's reasoning in *R.J. Reynolds Tobacco Co.* shows

22   that reliance is not a necessary element in all NDTPA claims, even though the

23   plaintiff in that case alleged reliance. 514 P.3d at 429–31 (citing *S. Serv. Corp. v.*

24   *Excel Bldg. Servs.*, 617 F. Supp. 2d 1097, 1100 (D. Nev. 2007)). *Reynolds*

25   instructs courts to interpret the NDTPA by its plain language, recognize it as a

26   "remedial statutory scheme [that] should be afforded liberal construction," and

27   to not "read in" requirements. 514 P.3d at 429–31 (internal citations omitted).

28   The *Reynolds* Court endorsed *Del Webb Communities, Inc. v. Partington*, 652 F.3d

1145, 1153 (9th Cir. 2011) (allowing developer to sue a building-inspection company for false statements to homeowners without alleging reliance), and *Southern Service*, 617 F. Supp. 2d at 1100 (allowing business competitors to sue one another for unfair practices without alleging reliance). This further supports finding that the NDTPA permits claims that do not allege reliance. Accordingly, the Court predicts that the Nevada Supreme Court would not require a showing of reliance to state a claim under the NDTPA in this case, and it denies HotEdge's motion to dismiss Plaintiff's NDTPA claim for failing to allege reliance.

### 2. Particularity

In addition, Summit has stated a NDTPA claim with particularity. A party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). An allegation of fraud must be accompanied by the "who, what, when, where, and how" of the allegation. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Summit alleges HotEdge began using Summit's "PRO" mark on their roof ice melt products around 2015 in the snowy markets where both companies sell their products by putting it on their advertisements and product models. (*See* ECF No. 29.) This satisfies Rule 9(b). Accordingly, the Court denies HotEdge's motion to dismiss Summit's NDTPA claim for failing to allege fraud with particularity.

### V. Conclusion.

It is ordered that Plaintiff's Motion for a Temporary Restraining Order, construed as a motion for preliminary injunctive relief, (ECF No. 6) be denied.

It is further ordered that Defendant's Motion to Dismiss Plaintiff's second and fourth claims (ECF No. 34) be denied.

It is further ordered that HotEdge's Motion to Strike (ECF No. 36) be denied as moot because Summit amended the reply that HotEdge sought to strike.

//

//

It is further ordered that both parties' motions to file additional documents (ECF Nos. 50, 52) in support of their positions regarding Summit's preliminary injunctive relief is granted.

DATED THIS 27th day of January 2025.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE